IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| J.M., et al. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:25-cv-01866-MC |
| | ) | |
| v. | ) | |
| | ) | April 3, 2026 |
| OREGON YOUTH AUTHORITY, et al. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | Portland, Oregon |
| | ) | |

STATUS CONFERENCE

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL J. MCSHANE

UNITED STATES DISTRICT COURT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| H.A.H., et al. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:25-cv-02266-MC |
| | ) | |
| v. | ) | |
| | ) | April 3, 2026 |
| OREGON YOUTH AUTHORITY, et al. | ) | |
| | ) | |
| Defendant. | ) | Portland, Oregon |

STATUS CONFERENCE

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL J. MCSHANE

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES FOR PLAINTIFFS

FOR THE PLAINTIFF(S):

JESSE A. MERRITHEW
Levi Merrithew Horst PC
610 SW Alder Street
Suite 415
Portland, OR 97205

FOR THE PLAINTIFF(S):

HONG (CHEN-CHEN) JIANG
Schroeter, Goldmark & Bender
401 Union Street
Suite 3400
Seattle, WA 98101

APPEARANCES FOR DEFENDANTS

FOR THE DEFENDANT(S):
NATHANIEL AGGREY
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301

FOR THE DEFENDANT(S):
JESSICA KAMPFE
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201

COUNSEL ALSO PRESENT

FOR THE PLAINTIFFS M.B., et al:
PAUL CASEY GALM
Paul C. Galm
Attorney at Law, LLC
50 SW Pine Street
Suite 403

FOR THE PLAINTIFFS M.B., et al.:
PETER B. JANCI
Crew Janci LLP
9755 SW Barnes Road
Suite 430
Portland, OR 97225

FOR THE PLAINTIFFS S.K., et al:
NEAL WEINGART
820 SW 2nd Avenue
Suite 200
Portland, OR 97204

FOR THE PLAINTIFFS M.C., et al:
JASON L. KAFOURY
Kafoury & McDougal
411 SW Second Avenue
Suite 200
Portland, OR 97204

COURT REPORTER: Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
United States District Courthouse
1000 SW Third Avenue, Room 301
Portland, OR 97204
(503)326-8191

* * *

TRANSCRIPT OF PROCEEDINGS

(April 3, 2026)

(In open court:)

THE COURT: Please remain seated.

Thank you, folks. It will be just a moment to get set up real quick so I can get my laptop going.

DEPUTY COURTROOM CLERK: The United States District Court for the District of Oregon is now in session. The Honorable Michael McShane presiding, and we are here for oral argument on defendants' motion to dismiss first claim Docket Number 6, in H.A.H., et al., v. Oregon Youth Authority, et al. Case Number 3:25-cv-02266-MC and also oral argument on defendants' motion to dismiss first claim, Docket Number 12, in J.M., et al., v. Oregon Youth Authority, et al. Case Number 3:25-cv-01866-MC.

And, Counsel, could you please identify yourselves, beginning with plaintiffs.

MR. MERRITHEW: Good morning, Your Honor.

Jesse Merrithew on behalf of all plaintiffs.

THE COURT: All right. Thank you, Mr. Merrithew.

MS. JIANG: Good morning, Your Honor.

Chen-Chen Jiang also on behalf of all plaintiffs.

THE COURT: Ms. Jiang, thank you.

MR. AGGREY: Nathaniel Aggrey on behalf of the State defendants.

THE COURT: Thank you, Mr. Aggrey.

MS. KAMPFE: Jessica Kampfe on behalf of State defendants.

THE COURT: Good to see you again.

We saw you yesterday on the same issues in other cases down in Eugene.

Mr. Merrithew, I'm assuming we can argue both cases together. It is the motion by the Government; and, again, I think yesterday I presented you with the *St. Clair* case and how these cases might be different, but if you would like to address that on behalf of Youth Authority.

MS. KAMPFE: Thank you, Your Honor.

Yes, I can start with talking about *St. Clair*.

Your Honor, these cases are distinguishable from *St. Clair* in a number of ways. The first and important way is that in the *St. Clair* matter there was an element of coercion that doesn't exist in these cases.

So in the *St. Clair* matter, the Court noted that Ms. St. Clair was taken advantage of by way of her addiction to methamphetamine and her ongoing involvement in criminal activity and that the officer involved in those matters used that as leverage to coerce her into a quid pro quo type of relationship, whereby, in exchange for unwanted sexual contact, he would not further prosecute her for -- under the ongoing criminal investigation for burglary.

In the present case, the youth have not stated that they were using drugs. They were not engaged in any ongoing criminal activity. They weren't facing additional criminal charges or longer prison sentences or OYA incarceration, and there was no element of coercion, and so that is a very big distinction between the *St. Clair* case and the matters before the Court.

Another distinction is that in *St. Clair* the plaintiff articulated that she didn't realize that she had been injured until she had read a newspaper article, and at that point in time she started to experience harm. So she experienced pain, anxiety, and other negative impacts at the moment at which she realized that she had been injured; and that's very different from the matters in front of us today.

When we look at the plaintiffs' pleadings in H.A.H. as well as in JMMP, first of all, the plaintiffs have pled very specific language that alerts the Court that they did realize they had been injured at the time. They talk about the nature of the touching, and so they used very sexualized language like "fondling of the penis and testicles" as well as "rubbing and stroking," and so they are alerting the Court and admitting that they knew that the touch was a sexual touch at the time that it happened.

They also alert the Court that they knew that the harm was being caused by the Oregon Youth Authority. They say

that they -- plaintiff was incarcerated at MacLaren Correctional Facility. They knew that they were incarcerated there. They were doing a medical appointment at MacLaren Medical Clinic. They knew that was associated with the Youth Authority. They were examined by --

THE COURT: But isn't there evidence that everything the Oregon Youth Authority did, in terms of those in contact with the youth, was to tell them "This is a normal medical procedure. Get over it. Don't complain." You know, "Things will only get worse."

I mean, we're talking -- what? -- mostly 14- and 15-year-olds?

MS. KAMPFE: Some of the plaintiffs are younger, 14 or 15; some of the plaintiffs were actually closer to 18, and some of them are alleging that this touching happened after they turned 18.

THE COURT: I don't see any of the 21- to 25-year-olds that were incarcerated at MacLaren in that same category. I mean, these are, you know, relatively vulnerable younger teenagers -- a large group of them; and they're being told this is a medical event.

MS. KAMPFE: And, Your Honor, I think Oregon's tolling statute specifically is in place to address that concern. Their claims didn't run while they were under the age of 18. Their claims ran at the time that they turned

19.

And so we're not making the argument that they needed to realize and file -- that their claims accrued and they needed to file before the statute of limitations ran under the age of 18, but certainly by the time they turned 19.

THE COURT: Even if they were lied to and figured out the harm later?

Literally, they're being told "This is a perfectly normal medical procedure. Get over it."

MS. KAMPFE: And, Your Honor, I do think there's some difference in what the plaintiffs have -- what individual plaintiffs have said the response was to their report. And in the complaints, they are -- some of the plaintiffs are saying that they took steps in order to advance their claims.

And so we see that in -- if you'll give me a moment.

THE COURT: Yeah.

No, I agree. Some did. Some filed grievances. Some called their parents, depending on which case. Maybe not right here in front of me on these. They were met with such indifference that I just wonder what you expect these individuals to do, and it seems to me that there's a factual issue as to whether it would be reasonable for them to have understood that that perceived harm caused them the injury that they then become aware of years later when they realize

"This organization did nothing to protect me."

I don't -- I mean, it -- I know we can go back and forth on how it's different than *St. Clair*, but we're still talking about a vulnerable -- even in *St. Clair*, there's no doubt she was injured at the time. I mean, it wasn't like she was drugged and didn't understand what had happened to her. It was when she discovered the constitutional injury that became significant that --

MS. KAMPFE: That's right, Your Honor. In *St. Clair*, the court does talk about this being a delayed accrual, in that she hadn't realized her injury until a later point in time, but when the court is examining why it is that her delayed accrual occurred, they're really looking at the coercive elements that were involved. And that had to do with the fact that this officer was saying, "I'm going to," you know, "pursue a criminal investigation that could land you in an incarcerative environment if you don't exchange sex with me," and that's --

THE COURT: Of course, these youth are already in an OYA correctional environment, where their freedoms are already limited.

MS. KAMPFE: And that wasn't going to get any worse as a result of reporting or --

THE COURT: Maybe not in these particular cases, but you remember in one of our cases yesterday there was a

threat that it could get worse.

Okay. I want to hear from the plaintiffs on this.

MR. MERRITHEW: Thank you, Your Honor.

The problem for the defendants is that the controlling law here is *St. Clair*. They base their motion largely on district court cases that didn't have the benefit of *St. Clair*, but we do, and I -- I disagree fundamentally that *St. Clair* is mostly about or specifically about coercion.

If you look at the claim accrual analysis in that case, what they focus on is the power imbalance between the law enforcement officer and the victim.

THE COURT: It was an adult victim; correct?

MR. MERRITHEW: It was an adult victim, Your Honor.

And here we have teenagers in a correctional institution, and the person who is abusing them is the person who is -- who is the only person they can turn to for their medical care.

So there is the same, if not greater, power imbalance between the victims in these cases and the victim in *St. Clair*.

I would also point out, Your Honor, that, from a legal perspective, any sexual contact between a corrections employee and an incarcerated individual is presumptively coercive. That's what the Eighth Amendment analysis says.

And so to say that there's not an element of coercion in these cases just turns a blind eye to both the facts and the law.

THE COURT: But there's certainly some individual plaintiffs who knew it was not only coercive but knew it was wrong and reported it. Of course, that went nowhere. But how does that play into their knowledge of the injury? And I'm assuming that may also play into, at a later time, experts testifying about delayed reporting.

MR. MERRITHEW: That's precisely right, Your Honor. And that, I think, is why the courts repeatedly say and mostly are addressing these cases on summary judgment, that these are highly fact-intensive inquiries, and it is useful to have expert input into what exactly the plaintiffs knew and when they knew it, which is the critical question. That's a fact-bound question.

So for some of these plaintiffs, they felt, as we have alleged, uncomfortable. They felt that something was off, and they made some report of that. And then they were assured, "No, no, everything is fine," by the people who are quite literally standing in for their parents at that moment.

So to simply believe that is a reasonable response to what they were told -- and we have specifically alleged, with respect to each plaintiff, that they did not realize

that they were injured or the harm that they suffered until much later and within two years of filing the lawsuits.

I would also point out that the defendants' position here, if you look forward as to what their defense is likely to be at trial, is incredibly hypocritical. Because what they're saying is that these children, who were in their care, were supposed to realize, without any doubt, that this was abuse at the time that they suffered it. But when they reported it to these defendants, the adults in charge of their care -- what these defendants will undoubtedly argue at trial is that they thought it was medical care.

So how are the children supposed to realize that it's abuse when the adults that were in charge of their custody didn't recognize it as abuse?

THE COURT: Okay. Thank you.

Anything further from the State?

MS. KAMPFE: Nothing further, Your Honor.

THE COURT: Okay. We'll get an opinion out, but I am going to deny the motion to dismiss. We're just not at that stage to understand completely the facts. These are facts -- factually intensive inquiries; and, you know, looking at *St. Clair*, you know, the real issue is the coercive nature, the vulnerability. I mean, here I know I'm stating what you all know; but, I mean, these are, for the most part, teenagers. Some of them young teenagers. They

are in a naturally coercive setting -- in custody. I'm sure each of them has their own individual vulnerabilities, in terms of their backgrounds, their family support, what kind of parenting or education they may have had around sexual matters, what their sexual development was at the time. I mean, all of these things play into these events where these children are seeking medical care from the only individual capable of giving it to them -- an authoritative figure who is telling them that this is a perfectly normal medical exam. Even those who have made complaints or filed grievances or questioned the activity were really shut down and told either that it was nothing to be concerned about, that it was part of a medical exam, or that they just needed to stay quiet.

All of this is going to play out factually; and then, of course, it is going to certainly assist any trier of fact to -- here, I think, in -- and from psychiatrists, psychologists, just how these issues play out in the minds of adolescents going into adulthood and the whole issue of delayed reporting, especially coming from this whole milieu of incarceration.

So I will -- we will get an opinion out on these cases, as we will on yesterday's cases. I do realize the Government is going to want to make a record in future cases. They can do that by filing motions. I don't plan to

have further oral argument. I don't think it's necessary to -- for the plaintiffs to file a response unless they feel it necessary, but I will be citing back to these earlier opinions as the basis for my finding.

Okay. That takes care of those issues, and I guess we're all done for today.

Well, I know. Let me find my notes here.

There are some discovery issues we need to discuss, and I'm not sure who is taking the lead on which issue.

First, there's an issue about certain document reports that were turned over in discovery that had redactions of the names of perhaps third parties, perhaps victims themselves, perhaps potential victims, and I would like to hear a little bit more about that.

And, Counsel, if you would introduce yourself for plaintiffs.

MR. GALM: Paul Galm, G-a-l-m -- Bar Number 002600 -- on behalf of various plaintiffs.

Do you need me to name the case numbers, Your Honor?

THE COURT: Do we need to name all the plaintiffs?

No, I don't think so. I think we'll simply -- we'll figure out how to produce a minute order or a written order that will include really all of these cases.

MR. GALM: Okay. I appreciate it. I'll be brief.

Oh, I'm sorry. Go ahead.

THE COURT: Then, Mr. Aggrey, you'll be arguing this issue?

MR. AGGREY: Yes. I was going to suggest perhaps -- there are a number of topics to address --

THE COURT: Okay.

MR. AGGREY: -- which brings us all here, and my suggestion is we start with the trial schedule, in terms of how these cases are going to be tried, and then, I think, you know, the discovery motions; and there's another pending matter before the Court regarding the expungement records.

THE COURT: Yeah.

MR. AGGREY: So my suggestion was to start with the trial schedule and the trial plan we have put forward before you.

THE COURT: Well, we know that the first trial is going to the first Monday in November. We do need to talk about who's going to participate in that trial.

We have a table over here too. I mean, we can spread out a little.

And this is --

MR JANCI: Mr. Janci.

THE COURT: Mr. Janci. I certainly see your name on a lot of these cases.

I know your approach to setting trial is kind of a combination of various cases with various plaintiffs'

counsel.

You're going to have to really convince me of that one. It just sounds to me like we're going to -- it's going to be much harder, from a court's perspective, to logistically navigate three separate plaintiff entities as opposed to, let's say, "First come, first serve," which would be, if we're looking at a larger, more -- excuse me -- I've got a lot of notes up here -- a larger selective case, it would really be one of yours, I believe.

MR. JANCI: Correct, Your Honor.

I think the M.B. case was the first case filed, if that's what you're looking for.

THE COURT: Yes. S.K., I think, with Mr. Betz. He was here yesterday. Let's try that one first. We have got one plaintiff.

You're ready to go, Mr. Weingart.

MR. WEINGART: Your Honor, I'm --

THE COURT: It's in Eugene. Even more convenient for me.

MR. WEINGART: Right.

And so, for the record, Your Honor, Neal Weingart on behalf of S.K. and E.G. I've just filed into this case a couple days ago, and I've been on it for a couple of weeks. What's interesting about S.K. and E.G. is E.G. is much newer to the case, and so my request would be that that be after

the first case that's filed for that reason.

THE COURT: Okay.

MR. JANCI: Your Honor, could I be heard on our proposal?

THE COURT: Yes.

MR. JANCI: At this point what we've proposed, Your Honor, is that our -- the Janci-Galm contingency and the Merrithew contingency put together a group of plaintiffs to be tried together. Those two firms.

And our thinking on that is that those two firms represent, I believe, about 85 percent of -- of the claimants. We have alignment with the State on a number of kind of the values, I think, or the goals that we're all trying to reach, which is that we want a diverse plaintiff population that's representative.

THE COURT: Let me ask you about that, though, because M.B. v. Oregon, you have ten plaintiffs.

MR. JANCI: Correct.

THE COURT: There's got to be some diversity in that.

MR. JANCI: Well, I think that's true. I have one issue with M.B. -- is that there are other staffers that are alleged as abusers in the M.B. case, which is a concern that the State has raised and that we agree with, that we think it would be cleanest to have a trial that is focused only on

the abuse by Dr. Edwards. That would be the most informative for all the remaining cases.

So, you know, we believe that together we can come up with a plaintiff pool that would be representative, that would be diverse, and that would allow the resulting verdict to be relied upon, at least in terms of evaluating future litigation risk by both of the two largest plaintiff groups; so, for those reasons, you know, we think that that would be most efficient.

The State's concerns seem to be questions about appeal; but, Your Honor, respectfully, I think the Court can deal with that through severance and consolidation and your other powers under FRCP 42. You know, we've looked at the Bellwether guidelines in trying to come up with a proposal that would help advance everyone's interests in getting a verdict or several verdicts that are representative and informative and can hopefully be -- you know, provide a path to the most efficiency.

THE COURT: So are you talking about taking plaintiffs out of specific cases and trying them together and leaving other plaintiffs?

Like, for instance, are you talking about, out of the M.B. v. Oregon, taking maybe, you know, two or three of those plaintiffs and combining them with --

MR. JANCI: Yes, Your Honor.

THE COURT: Okay.

MR. JANCI: And then --

THE COURT: Mr. Aggrey, I'll give you a chance. I know you're popping up there. Believe me. Mr. Janci is going to have to convince me that this is the way to go.

Isn't there any single case involving multiple plaintiffs that just focuses on Dr. Edwards?

MR. JANCI: I'm sure there is, Your Honor. I'm sure there is.

Again, I think the -- our core -- the core value, I think, would be in having plaintiffs that are represented by both our firm and the Merrithew firm so that a verdict can be -- I mean, there's 125 plaintiffs filed. You know, we can each have our own trials, but whatever the result of Mr. Galm's and I's trial alone, I just can't speak to how informative that's going to be for Mr. Merrithew, if they're not involved, or other plaintiffs, if they're not involved.

THE COURT: I mean, it's going to be pretty instructive, depending on what the jury does.

You know, that's what firms do all the time, and they don't necessarily participate in the initial litigation.

How many plaintiffs are you considering in your proposal?

MR. JANCI: We had proposed four or five from our group and four or five from Mr. Merrithew's group, and my

understanding is that the State does not object to, you know, a multi-plaintiff trial. It's just this issue of which plaintiffs they're drawn from.

MR. MERRITHEW: Another difference, Your Honor, that I think creates some practical problems is I don't think Mr. Janci's firm represents any plaintiffs who are incarcerated. We do. Quite a few of our clients are incarcerated, and so I -- as I'm sure the Court is aware, that creates some logistical problems for a civil trial.

THE COURT: Where are they incarcerated?

MR. MERRITHEW: Throughout the state of Oregon.

THE COURT: In Oregon?

MR. AGGREY: Yeah. I think we might have one client who's incarcerated in the state of Washington.

So, as we're looking for both diversity of the plaintiff pool, right, I could see the State arguing that, you know, a result from Mr. Janci and Mr. Galm about the value of a non-incarcerated client versus incarcerated clients is different, and -- and from a perspective of just the practicality, I mean --

THE COURT: Wouldn't they be arguing that in trial? If your clients are either not appearing whatsoever or, at best, appearing by video?

MR. MERRITHEW: Right. But we'll get the jury's response to that, and we'll be able to gauge the remaining

incarcerated clients' cases appropriately.

THE COURT: But you have some cases too of non-incarcerated clients.

MR. MERRITHEW: Yes.

THE COURT: And you could certainly figure that out in one of your cases.

MR. MERRITHEW: We could, but then that's the other side of the coin, Your Honor -- is that we would be trying to logistically present a trial with -- I think six incarcerated clients -- is what we have in one of our cases, and the logistics of getting all those folks presented to a jury in a single trial -- to me, with my experience, you know, trying civil cases with incarcerated clients, getting one person in front of a jury at the right time in order to get that person's testimony in front of the jury is difficult enough. The logistics of doing six seems like a very large burden for both the parties and the Court.

THE COURT: It does, which convinces me not to do it this way. Because that's going to be an added burden to this first trial where, you know, logistically, it's just going to get harder.

You know, we may have to think about, depending on where folks are incarcerated -- I'm talking about down the road -- an approach. I mean, if they're in the Pendleton Division, we've had very good luck having them in the

trial -- at the trial. So there are possible ways.

Here in Portland, you know, my experience is that the judges simply don't -- I'm not going to be trying every one of these cases. Judges don't bring in inmates to trial.

MR. MERRITHEW: And we expected that would be the case and that they would have to appear remotely; but even then, of course, we're still dealing with scheduling with the various prisons.

I think my memory is that a big chunk of them are in either OSP or OSCI down in Salem.

THE COURT: Okay. I don't want to go forward with multiple plaintiff attorneys and pulling plaintiffs out of individual cases and then figuring out what to do with the other plaintiffs.

I think we need, Mr. Janci, for you to pick your number one case. If you were not to pick one, I would say M.B. is first in and first out.

MR. AGGREY: Your Honor, can I speak briefly on this?

THE COURT: I thought I was speaking for you, Mr. Aggrey.

Go ahead.

MR. AGGREY: Yes. I think Your Honor is right.

You know, we led on this topic; we captioned all the cases that Mr. Galm and Mr. Janci have, and there are

several that have more than 10 plaintiffs even. There's a case that has 16 plaintiffs. The J.A.L. case has 16 plaintiffs. They could pick that one.

Yeah, I just think, you know, hearing Mr. Merrithew, the approach that's being suggested by Mr. Janci just has profound inefficiency and uncertainty, and I think, taking the case-by-case approach makes common sense, starting with one of the earlier filed cases that was brought forward by Mr. Galm and Mr. Janci, and those cases are also much further along in discovery than any of the other cases that came after.

THE COURT: Sure. I agree.

And part of my concern is, you know, the time commitment for jurors; and I -- you know, I know both of you are perfectly capable of being efficient; but, you know, it still means additional closing arguments, additional examination of witnesses, maybe even separate experts. I can just see that it's going to add time onto the jurors' schedule, which always runs the risk of things occurring and delaying.

So I would like to -- and I --

Mr. Janci, I don't have a preference, but I would like you to pick one of your cases, M.B. would be the default.

MR. JANCI: We understand, Your Honor.

I would like to confer with Mr. Galm and talk with the

State and, you know, identify what we think would be the most appropriate case.

THE COURT: Okay.

MR. JANCI: Thank you, Your Honor.

MR. AGGREY: Another thing about the selection of the case, Your Honor?

THE COURT: Yes.

MR. AGGREY: We're going to get to this point, but in terms of the discovery deadlines, I think there needs to be a date where the plaintiffs need to identify the case that they're going to go with so that it can allow us to schedule those plaintiffs' depositions.

We are currently booked out through mid-May right now with the defendants' depositions, and we want to know which case the plaintiffs will move forward with so that we can start scheduling those plaintiffs' depositions.

So I would just request that, whether it's seven days or --

THE COURT: They have one week.

MR. AGGREY: Thank you, Your Honor.

MR. JANCI: Understood, Your Honor.

THE COURT: That will give us -- by the way, a pretrial conference date of -- October 19th is what I'll set right now, and if that causes problems with your schedules, we're pretty open, in terms of scheduling.

I hate to even ask this, but does anybody have a preference for Eugene for trial? OYA actually is in, I believe -- MacLaren, I believe, is in the Eugene Division.

MR. JANCI: We do not, Your Honor.

THE COURT: Okay. Government?

MR. AGGREY: Your Honor is correct. I think Eugene is a proper venue.

THE COURT: All right. I guess what I want to hear -- I don't know where the plaintiffs or the experts -- where the bulk of the witnesses are coming from, and I do want to accommodate them if there is hardship there.

It's just hard for me to be away too long from my donkeys and my bees and gardens and my little farm, but how long are we perceiving a trial to be in November?

MR. AGGREY: It depends on which case they select.

THE COURT: Yeah, I think that's true.

MR. JANCI: So we're happy to -- happy to confer with the State about that and get back to the Court within the same time frame, and we will certainly look at the kind of profile of the plaintiffs that are in the case that we're proposing and report to the Court on that regarding the location of trial.

THE COURT: Okay. Wonderful.

And, you know, I'm not going to say, you know, out of my convenience, it has to be Eugene. It does require me to

bring some of my staff up to Portland, but if that's outweighed by the number of people who are going to have to be staying in hotels in Eugene, we'll certainly take that into consideration.

Okay. There are now some discovery issues we need to discuss, and then we can talk about some of the deadlines that have been proposed. But there's, first, an issue about redactions.

Is that something we can cover now, or is there another area we need to --

MR. MERRITHEW: Well, Your Honor, I understand the Court's decision on the first trial, but it's my understanding that the Court intended to schedule subsequent trials each month thereafter.

THE COURT: Yes.

MR. MERRITHEW: And so should we discuss how that is going to play out?

THE COURT: Thank you. And I actually did mean to discuss that.

Here is how -- I don't think it's practical -- if the idea is this November trial is to give subsequent cases an understanding of how best to settle, that we, you know, finish maybe well into November and then turn around and start a December trial. I think that kind of defeats its purpose, and December is a tough month -- let's face it --

for a lot of people. It's a holiday month. The kids are home, and there's a lot of chaos going on. So my thought is to begin -- I mean, we basically reconvene trials in January. Maybe not right at New Year's Eve, but, yeah, January 4th, and then proceed to February.

Now, what I'll be doing shortly is sending an email out to all of the judges. You know, these -- I'm not going to try all the cases, and I've taken these cases from a wide variety of magistrate and district judges, but I do need to find out which of those are willing to basically earmark the first Monday of the month next year for one of these trials.

The difficulty is I probably grabbed up all these cases before the opt-out consent issues would have even been available to you. So I probably need to know whether you're going to -- there's no point in me setting it in front of a magistrate judge if you're not going to consent.

It would probably be the magistrate judges, I'm assuming, in Portland where the bulk of the cases are, but I do need to know if you're going to consent to magistrate jurisdiction.

So, if I could get some status reports from you on that issue, I don't want to waste their time and your time.

Otherwise, I'll be asking, you know, Judges Nelson; Immergut; Simon -- who am I forgetting here? -- Baggio; Kasubhai; probably our senior judges, Mosman and Hernandez,

if, over the course of the next year, they would take one of those first Mondays.

MR. MERRITHEW: Is the concept that multiple cases could be going in the same month or --

THE COURT: No. I don't think that's realistic for the State. I mean, unless that's why you --

Ms. Kampfe, are you coming on so that you can do multiple cases at once?

MS. KAMPFE: No, Your Honor. That's not why I'm coming on.

THE COURT: All right. So we'll just bring on -- it's going to be -- now, it may be that there's some -- we can combine some of the -- you know, one-person, two- -- one-plaintiff, two-plaintiff cases with, you know, a case with more.

MR. MERRITHEW: Okay. The reason I'm asking is simply to try and figure out when our first trial is likely to go and whether that might be the January trial.

THE COURT: Let's give you the January trial.

MR. MERRITHEW: Okay.

THE COURT: That would be January 4th, and I don't know who's going to be trying it yet, but it could be me as well.

MR. AGGREY: And on this point, Your Honor, I know some of the parties in the room also have a question around,

to the extent, you know, we're going to be staggering these cases, how does the discovery deadline impact those cases?

I know one of our matters here is extending the discovery deadline, particularly for the first trial. How does that impact the other cases and those discovery deadlines?

THE COURT: With some adjustment, that we're going to talk about in a moment, I'm not planning on a dramatic change in discovery deadlines.

Now, there are cases -- I mean, some cases have trickled in, I think, just -- I think one was transferred over to me just last week. So my thought is the cases that have been brought in since December of last year. Going forward -- the parties need to confer and set a new set of discovery deadlines; and they're going to be getting set, obviously, much later, in terms of trials.

My hope is that at that point Judge Hallman will also be doing his magic and you'll be discussing more settlement as we go down the road.

I guess, with regard to the issue of extending the current discovery deadlines -- and let me find my correct notes -- the current fact discovery cutoff is April 30th. Now, the State is proposing July 15th; the plaintiff is proposing June 15th. I'm going to adopt the plaintiffs' proposal here of June 15th for the discovery deadline -- the

fact discovery deadline.

Expert disclosures due July 15th. I think I may have -- if I haven't said this earlier, I don't allow depositions of experts unless there's a good cause motion, and then I'll review it at that time, but I -- I do not think this kind of expert discovery that I'm anticipating requires anything other than an exchange of reports.

And that leaves a dispositive motion cutoff of 8/6. I'll be honest; I'm not anticipating that there are a lot of factual issues, especially around negligence.

I mean, I haven't -- I haven't seen the Ninth Circuit do anything but reverse me anytime I've granted summary judgment on a negligence action. I mean, there's so -- these are so fact and credibly specific, I'm willing certainly to look at dispositive motions. I'll decide on them very quickly. They're not going to be drawn out into anywhere near the first trial date. So I'm thinking an August 6th deadline for dispositive motions.

I'm assuming most of them are going to recenter us on probably the statute of limitation issues, and there may be some that will be dispositive, but I think still there's going to be a lot of factual issues that are maybe better served for a directed verdict in that first case.

That would leave a response to the dispositive motions by August 27th and then a September 10th reply. And I will

get out an order on any summary judgment motions probably -- if we're going to do oral argument, it's going to be shortly after the reply is due, but I plan on ruling on that within weeks of the briefing schedule being completed.

I don't want to keep that hanging out there.

MR. KAFOURY: Your Honor, this is Jason Kafoury.

Can we be heard briefly on the scheduling and the discovery matters? Because we have a separate case that we represent four plaintiffs on that was filed in July of 2025.

THE COURT: Okay.

MR. KAFOURY: We are currently under the scheduling order for this April 30th cutoff.

THE COURT: I just extended it to June 15th.

MR. KAFOURY: Correct. So there's several issues. Obviously, there are, I think, 17 lawsuits. 130 plaintiffs that are -- currently, we've all agreed to put under an SPO, and I realize that we and our firm are more of a minor player in this than the Janci and Merrithew firms in terms of number of plaintiffs.

The Janci group has moved forward with depositions starting next week, and we've had conferral with the State about this. The State has not committed one way or another whether people that are in later-filed cases would be able to reopen those depositions, and so that's something we need Court guidance on. I think that's sort of issue one.

THE COURT: Can we take care of that one right now?

MR. KAFOURY: Yeah, we can.

THE COURT: Otherwise, I might lose track.

MR. KAFOURY: Okay. That's fine.

THE COURT: On that issue, my thought is you are going to have to rely on the depositions that are, you know, currently or about to be conducted.

That being said, you can certainly -- I expect you to confer with the folks who are conducting those depositions to make sure that there may be some specific issues that you need addressed -- and then you can certainly, down the road, if there are case-specific questions that need to be addressed, you can move to reopen depositions in a manner that's timely.

MR. KAFOURY: Okay.

THE COURT: That issue -- you may be able to confer and very quickly, with the State, determine that, you know, a 15-minute video deposition is going to take care of whatever additional issues might involve your case, but it's not going to be a repeat of what's already occurred in the original depositions.

Does that give you at least some comfort there, Mr. Kafoury?

MR. KAFOURY: Yeah, that -- I think that's helpful

guidance. Let me try to re-clarify what I think you're saying.

All plaintiffs' attorneys that have -- that are under the current discovery cutoff should be doing these depositions with the thought that they're not getting a second bite at the apple, unless specific to our case examples, something comes up or a newly discovered document.

I will say I think that's going to come up here soon. The State just gave us 9,000 pages of emails related to depositions next week. I didn't know until this hearing what your thought was on whether I was going to have another crack at these folks to do depositions. So now that I'm hearing this, I think it makes it a little challenging for the people that weren't taking the lead, that weren't scheduling these depositions, like us, to be ready to be doing depos next week on things where we just received all these emails this week, and I -- and there's depositions scheduled every week, I think, over April and then into May.

So that's an issue that I wanted to raise with the Court.

THE COURT: It does propose a lot of challenges. There are a lot of plaintiff attorneys, and if you work together, you may be able to get through these documents quicker and highlight to the person managing the deposition specific areas of inquiry. That would be my suggestion. I

can't make you do that, obviously; but I think you all have generally the same goal, and there may be a way of dividing up and conquering on that one.

MR. KAFOURY: That's guidance. We appreciate it. Can we take up another issue, then?

THE COURT: Yes.

MR. KAFOURY: I conferred with the State about this. I don't think the State has an objection for some of the later-filed cases of decoupling the current discovery cutoff to move those for ones that are not part of the November or the January trial.

Does the Court -- is the Court willing to entertain that idea?

THE COURT: If you folks want to confer on cases that are going to happen in the spring, the summer, the fall --

MR. KAFOURY: Okay.

THE COURT: -- give yourself a little breathing room -- maybe hold off on discovery until you look at some -- on how some of these cases fall out, and then call up Judge Hallman and say, "We want to figure this out," that's all great to me.

MR. KAFOURY: Okay.

THE COURT: So, if you folks want to confer about later cases -- and we should probably get a February case

scheduled too, just so we kind of know where we're going in the winter.

MR. KAFOURY: Okay.

THE COURT: Just remind me to remind them to do that.

MR. KAFOURY: We'll work with the State and send some sort of joint proposal for later-filed cases, in terms of the discovery cutoff, that are not part of the first November trial date.

Is that --

THE COURT: Yes.

MR. KAFOURY: Okay. I think those -- yeah, the discovery and the depositions and the trial dates were the main things I had.

So thanks.

THE COURT: Okay. Thank you.

It's good to see you, Mr. Kafoury.

MR. KAFOURY: It's good to see you too.

THE COURT: How's your dad? I haven't seen him in a while.

MR. KAFOURY: He's turning 80 this summer, but he's still crushing it.

THE COURT: Tell him I said, "Hello." I've always -- some of my more memorable moments in the courtroom were all with him. Always in good ways.

Okay. Discovery issues around -- let's -- redactions, which is where I had somehow thought we would start, but --

MR. GALM: Your Honor, I'll try to be brief. There are two categories of redactions that we've asked the Court to take a look at: One involves the identity of youths who made complaints in a lot of the documents that we've gotten.

For example, grievance documents. The names of the youths have been redacted. And then another smaller category is the name of people who reported who are not youths. And, by the way, these youths are nonparty youths, for the most part, at least nonparties to us. I don't know if there are parties in other firms' cases.

The base --

THE COURT: So --

MR. GALM: Go ahead.

THE COURT: So, yeah, some of these folks actually could be plaintiffs in other cases.

MR. GALM: They could be.

THE COURT: You wouldn't know because they were redacted.

MR. GALM: Exactly.

And the base argument simply is there's a distinction that, I think, is being lost. There's been statutes cited by the defense before that talks about these documents

generally being confidential, and our simple argument is, while that may be true within this case or any case, they're still discoverable. We already have a PO in place anyway; so it preserves the confidentiality of this information beyond the walls of this courtroom, and I -- I haven't seen a response from the State on this email that we had sent a few weeks ago. So I'm not really sure, unless they sent it and forgot to include us. But that's the basic gist of our argument, in terms of getting that redacted information.

THE COURT: Okay. On that issue?

MR. AGGREY: Your Honor, the records and the information that is being sought are not the information or records that belong to the plaintiffs, as Mr. Galm just stated. What we're talking about are OYA youth files of other youth who are not plaintiffs, right, unique to the firm, the attorney; and so, in those cases, we do not have consent to release, say, a youth's medical records and other privileged records; and the statute that's on point, ORS 419A.257, classifies these records as privileged. And under FRCP 26(b), for what's discoverable, it excludes privileged information from discovery, and so to the extent that we can disclose those documents, we -- we must have the consent of that youth or a court order -- a court order of juvenile jurisdiction -- the juvenile court that adjudicated the youth at OYA.

THE COURT: Not a federal court order?

MR. AGGREY: That's part of the question.

And I think that issue is implicated in the expunction motion or the expunction issue that we have put before the Court that Your Honor has yet to rule on.

I think ruling on that may shed light on this other issue of whether or not OYA must disclose privileged information of non-plaintiff youths, who we do not have consent, to attorneys who do not represent those people.

THE COURT: Here is what I would like to do on the redaction issue: I'm going to order that the unredacted documents be turned over for attorney eyes only. The attorneys can review the names. Now, some of these may be named plaintiffs in other -- other cases before the Court, and then they would be allowed to have some discussion with those youths' -- well, plaintiffs' counsel about, you know, whether they can assist in their own litigation.

I think, if there are third-party names, especially when we're talking about youth making reports, the next step would be for the defense to approach the Court, requesting some -- some way in which the Court could, through counsel, really, approach this third party to let them know that they may speak to counsel if they wish, but they don't have to. These names will remain confidential. But that they did file a report one time involving Oregon Youth Authority,

counsel wants to discuss that matter with them, and they can choose to discuss it with them or not discuss it with them and that that decision would be made to the Court.

If they choose to discuss, I would give permission, then, for plaintiffs' counsel, or the State as well, to contact them.

I probably also would say they have a right to, you know, have an attorney present.

MR. GALM: Can I just ask one clarifying question, Your Honor?

THE COURT: It's kind of a little convoluted way of putting it, but I'm trying to think of how we protect somebody who really doesn't want to be contacted in a confidential document. It may be privileged, but give them an opportunity to basically waive that and say, "Sure. I'll talk to you."

MR. GALM: I understand that, Your Honor, and it makes sense under the circumstances.

My only follow-up question is would it be the same process if we're only looking to review their OYA file versus talk to them directly?

THE COURT: I don't know. I guess my thought is, if it remains for attorney eyes only -- I mean, my concern is there may be something, then, in that file where, you know, one of the named defendants, in fact, did know

something about something or should have known a report that was coming through or a grievance that went to a particular person, and that does become very relevant for the plaintiffs to know. So I do think you get to review the report.

Again, how we use this confidential information, we might have to have a further discussion, but it seems to me you should be able to at least -- the attorneys, without any, you know, further contact with individuals, should be able to review internally the report.

MR. AGGREY: And the attorney eyes only guidance is helpful, Your Honor. So thank you for that.

I would note that, of course, we're not redacting defendants' names in these reports.

THE COURT: Sure.

MR. AGGREY: To the extent that, you know, a youth made a complaint against, you know, a director or a group life coordinator, those names are available and are not redacted in the reports that we've provided.

THE COURT: Sure. Okay.

MR. MERRITHEW: Your Honor, one wrinkle to this. Mr. Galm mentioned this at the outset, but it appears, from context, at least, that at least one of these main reports made in 2013 was actually made by a youth's mother to the Oregon Youth Authority, and I don't think the same analysis

applies with respect to the mother calling up the Youth Authority and complaining about conduct, and so --

THE COURT: But certainly a privileged medical record or a -- I think she can be contacted. I think her name needs to be turned over. She's an adult. She's a third party making contact with defendants about a report of child abuse.

MR. MERRITHEW: Thank you.

THE COURT: Expungement. I am going -- there may not be expungement records. I think the State previously made that clear, that some of those have been destroyed, but I agree with the defendant -- with the plaintiffs. I'm sorry. When you sit over here, I think of you as defense.

I agree with the plaintiffs that, you know, the expungement statute is to protect the individuals whose records are being expunged. It isn't to keep the records from them, necessarily.

And I think, especially in light of these allegations, the nature of these charges, any records that are available to the State, that haven't been destroyed, do need to be turned over.

Are there other discovery matters we need to discuss?

MR. GALM: Not from me, Your Honor.

THE COURT: Anyone else?

Okay. Anything else we need to discuss at all today?

MR. KAFOURY: Your Honor, just one last thing:
Do you want the parties to confer about the February trial? I know we scheduled now the November one -- and just get back to the Court?

THE COURT: Right. You'll get us the January trial; Mr. Merrithew is going to --

MR. KAFOURY: Going to get --

THE COURT: No, you're going to get us the November trial.
Sorry.

MR. JANCI: November.

THE COURT: Mr. Janci will get us the November trial, Mr. Merrithew will get us the January trial.
Are you going to get us the February trial?

MR. KAFOURY: We can potentially take the February trial. We'll talk it over and confirm.

THE COURT: All right. And then I do need to know -- I'm not going to feed it back to anybody; but, obviously, it helps -- it's easier for the Court if there is some consent. Some of you -- you know who our magistrate judges are; so, if there can be some consent, it would make it a little easier for us to keep this schedule going. So please let me know if that --

MR. MERCHANT: How do you want us to communicate that?

THE COURT: Directly with -- Mr. Svelund is my career clerk, who will be working on all these cases. He'll email all of you so you know how to contact him with some of the logistics stuff.

Just because of schedules, I don't know if Judge Armistead really will be available. So my guess is that it's Judge Beckerman, Judge You, and Judge Russo.

Okay. All right. Thank you, folks. I really appreciate all the work you're doing on this case.

MR. MERRITHEW: Thank you, Your Honor.

MS. KAMPFE: Thank you.

THE COURT: Are people still meeting? Does Judge Hallman have things set up where people are talking or --

MR. AGGREY: He's still out there.

THE COURT: He's still -- I'm going to be out there in Pendleton starting this next week; so --

MR. AGGREY: I have not approached him specifically, but I certainly hope we can get there as we do more discovery.

THE COURT: All right. Thank you so much.

(Hearing concluded at 11:05 AM.)

C E R T I F I C A T E

J. M., et al v. Oregon Youth Authority, et al.

3:25-cv-01866-MC

and

H.A.H., et al v. Oregon Youth Authority, et al.

3:25-cv-02266-MC

Status Conference

April 3, 2026

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause. A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC

Official Court Reporter — Signature Date: 4/22/2026
Oregon CSR No. 98-0346 — CSR Expiration Date: 9/30/2026